Morning. I'm Jim Ellison. I'm the attorney for Shani of RAR. If we had been able to get to Garad in Somalia and gotten our two witnesses that we proffered, it's our position that the outcome of the trial would have been different. We had a duress defense. My client, he's a Bantu. He's not a Somali. He's a Bantu. All the other guys on the boat were actually Somalis. We went through all that effort. You were representing Mr. Ebrar? I do, yes sir. And Ebrar was up in Besaso, which is in the northern part of the country. He's really from the southern part of the country. He got up to the north. He then goes to Garad, and at that point he's working in a grocery store, and then somebody comes in and says, you know, you're a mechanic, and then he goes to work with a mechanic, and then the pirate, the guy who's putting it all together, Balahule, that's his name, Balahule comes, asks my client to go out on a boat and fix the boat. It's at that point, once he's on the other ship, judge, the jury did not find my client as a shooter, because in federal court, as you all know, it's aiding and abetting. There's no trigger man. My client was never ruled, if you look in the They went on to aiding and abetting. That was their theory the whole time. They've never shown my client as being a shooter. There was evidence both ways. I mean, there's a guy, Hindy, who was actually a shooter, and they didn't even charge him with that. So we would suggest that it applies to everything, because there's no finding. When the jury made their findings, they did not say that my client was a shooter. So that's why it applies to the whole case. He was convicted of murder, but he wasn't convicted of being the trigger man. So it would be our suggestion, I think it's our position, I think, as long as the rest would apply to that, because he was simply aiding and abetting. Well, we don't know that. Well, yes sir, it's beyond the subpoena power of the court, but I never even got to be able to find those two witnesses. My client told me about them. I had my investigators. They got as far as Mogadishu. They couldn't get up to Garod to find them. I had detailed information about where they were at, and I couldn't get to the two witnesses. If I had been able to find the two witnesses. But they were beyond the subpoena power. They were, but Mr. Hatch, in other cases, has allowed, and Mr. Hatch, we talked about it, and he said, you can find the witnesses. I'm talking about this case. Yes sir. In this case, if I could have found them, then we could have had them testified by telephone, or we could have had them, because he's done it in other cases, and we could have done it in this case. Those witnesses weren't on the ship. No sir, I'm talking about the two witnesses, the two Somali people that were in Garod, that would testify that my client did not have an AK-47 when he joined this group. What should your, what remedy do you, or do you ask for? I think the case should be dismissed, Judge. Dismiss the indictment. Yes sir. If we bring in a guy over here to be tried, he should have the same constitutional rights as some guy who gets, who's simply caught up in a robbery at a 7-Eleven in Newport News. It's a dismissal of indictment, that circumstance, really an extraordinary remedy. It's an extraordinary remedy? This is an extraordinary case. I didn't, I didn't ask for that. Yes sir. It is. You just, I'm not arguing with you. I'm sorry. You just think that, I know you're sitting on go, but you just think that it is extraordinary, you, it is extraordinary, but you think it's justified in this case. Yes sir. Isn't, wasn't the court rather reasonable in what it offered as an alternative? That your client could testify in a trial and that cross-examination would be limited? On that point, isn't that what she offered? That is, yes. Isn't that extraordinary? She's a good judge. No, no, no. Yes sir, it is, it is. I've tried cases for 12 years as a district court judge. Yes sir. And I can tell you this, and then you can comment on it, so I'll be a question. All right. To say to a defendant, I'm going to let you take the stand and testify on some small snippet, and you can't be cross-examined beyond that, I think you would have to agree that's extraordinary, because normally what you say is, you take the stand, and if you don't answer all the questions I think are appropriate and relevant, I will strike all of your testimony. In other words, you can't get up and say a few favorable things, so isn't that a judge that's trying to do an extraordinary thing to protect your client? Yes sir. And do you think, isn't really, you may not agree with it, but what she did, wasn't that an effort to balance your concerns off against the extraordinary remedy, which I know you would have preferred? Isn't that what she did? Yes sir. You don't think what she did was unreasonable, do you? No sir. You just think that, your argument is you had an absolute right that couldn't be salvaged any other way. That is correct, because still, if I didn't have those two witnesses, and if they were being able to testify the way that I anticipated their testimony to be, and the way that we proffered them to be, then Mr. O'Barra could have testified to the whole thing. It was a tactical decision on my part, not to put him on, because we didn't have anybody back up his story. So, what's the point, and then they have a whole bunch of folks that were doing something different. Oh no, wait a minute now, you tried cases, and you're telling me the standard is if only the defendant will say something, they don't testify? That happens all the time. Well, but you're probably going to lose, so the better thing is if you've got a couple more witnesses that are going to be on your side, then it helps your case a whole lot. I understand the argument you're making, it strikes me that she did it, she is a good judge, she did a pretty extraordinary job, I think, of trying to fashion some remedy that was, acknowledged the power of the court, and the issues at play, I think. Yeah, but you know, we talked about these cases to present a complete defense, and this is the problem. When you bring somebody over from Somalia, and you try them over here, then, and if I've got two witnesses, because if it's the Newport News, we're tracking... Did you identify to the FBI several witnesses? I did, I identified them to the court. You know, you identified them to the court, you didn't call them? No sir, I wasn't able to, I'm not, I wasn't able to get them, my investigators were not able physically to go to the city where the two witnesses were at. I thought that you identified some of the witnesses who were actually on the vessel. There were also four Yemeni fishermen. Did you call those? No sir, those were the ones that were released back to Yemen. Well, why didn't you call the witnesses that you identified? No sir, there were four Yemenis, and they weren't there, because they were already, they had been released out on the high sea when the incident occurred. And then the other two witnesses that I wanted were two folks that we couldn't even get to talk to, we couldn't get over to the city to find them. So I didn't have those, they just weren't around. Were there a lot of the pirate co-defendants in this case that testified? They testified against me. They implicated your client rather directly and said that he had actually operated a grenade launcher on board the vessel? That's what they said. And they said everyone on the boat was participating in the mission very clearly. And your whole defense was that he was kidnapped and required to work as a pirate. But you have an awful lot of testimony from everybody on the vessel that he entered into the spirit of the thing fully, and that he was a willing participant in the entire mission, and that he was operating a grenade launcher against the intercepting ship. And that, how do you explain all that? Well, Judge, I don't know about the grenade launcher, they didn't say he fired anything. But it was, it's more subtle, and this is the point of the argument. More subtle? Yes sir, because here's the deal. Because it's not normally you got co-defendants who were testifying against your client. It would be almost like if you had 10 co-defendants and nine of them were white, and it was one black guy, and the nine white guys are saying, he's part of it, he did this, he did this, he did this. That is the situation that I had. Because my client was a Bantu, he's not a Somali, he's not part of their whole clan structure. Did the judge give a duress instruction? Yes sir. Were you allowed to argue duress to the jury? I did. What evidence was there on which for her to justify a duress instruction? It was the whole ethnic issue. So in other words, didn't she go beyond again? Don't you think that she could have been under abuse of discretion? She could have not allowed a duress, she would not have given a duress instruction, and would not have allowed you to argue it. Isn't that possible? Yes. And maybe even likely? Probably. Okay. Probably. But again, it's nice to give me the instruction, but if I don't have my witnesses that are going to back it up, then it's sort of meaningless. I mean, it was really nice of her to do all that, and it's not her fault that I couldn't get the witnesses. Well, that's good. For the record, for you, it means that duress was important enough to instruct the jury, therefore made your not having those witnesses more important. I couldn't back up any. I just couldn't back it up with not having the witnesses. Right, exactly. Other than the harm, obviously. Right. That's the argument. That's the argument. Thank you very much. All right. Thank you. Mr. Woodward. Good morning. May it please the court. I'm Larry Woodward. I represent Mr. Aboukar Osman-Belay, and I guess I would start by saying I was struck by something Judge Wilkinson said in the last argument. Sometimes you're darned if you do and darned if you don't. It's very seldom I would appear before the court, and even if the court were to grant every bit of relief I'm asking for, my client still ends up with 16 or 17 life sentences. So I would say that my argument is really a jurisdictional issue. The boat was taken about 900 miles, 950 miles from Somalia out into water. It's not exactly certain, but as the case proceeded, the boat was getting closer and closer to the Somali shoreline. The Navy intervened. It was intervened 33 miles off. Well, the real issue that I'm arguing is that the murders and the firearm charges, they were somewhere between 33 and 40 miles from the nearest part of the Somali coast. That's considerably more than the 12 miles that's normally recognized as a nation's territorial waters. Absolutely, Your Honor. Those are high seas, aren't they? Well, that's my argument is that because the treaty, the UNCLOS Treaty, the United Nations Convention on the Law of the Seas, has never been ratified by the United States. It has been ratified by Somalia. Yes, sir. But Somalia has also opined, if that's the right word, or demanded a 200-mile sea. Now, the United States has not recognized that. Which would provide an almost complete sanctuary for any kind of acts of piracy within 200 miles of the Somali coast? Well, it would certainly not provide a sanctuary for piracy, Your Honor, because the issue, as you know, in a piracy case, the jurisdiction is the high seas. And I'm not arguing to dismiss the piracy charges. The murder and firearm charges are in the special maritime and territorial jurisdiction of the United States. So that's why, if you notice my appeal, it only relates to the murder charges and the discharge of the firearms. So that would not be correct that piracy— But felonies could not be charged within this 200-mile limit, right? Felonies that one of the elements of the offense is the special maritime and jurisdiction of the United States. That would be correct. Pirates do commit felonies. And although there may be a specific provision exempting piracy, you argue that it doesn't exempt felonies. I argue that the law, the evidence in this case, they did not prove that this murder and the firearm charges occurred within the special maritime jurisdiction of the United States. But the court is exactly right. The whole issue relates on what, you know, does the United States attorney and the district court in Norfolk get to decide what Somalia's territorial sea is? You do realize the implication of extending sovereign rights from a 12-mile distance from a nation's particular shores to a 200-mile zone? Well, I understand what I— Implications of that for piracy and for every other kind of shipping would be absolutely staggering. Well, Your Honor, again, I don't think it would have any implication to piracy. But the fact is, we're not here about whether we're extending sovereign rights or making a political decision about what treaties apply and who needs to ratify a treaty. What we're here about is whether under a criminal statute, which has to be strictly construed against the United States, did they prove that they had jurisdiction over this set of offenses. So, again— Make your best argument why the U.S. did not. My best argument why the U.S. did not is they did not— that the United States has never ratified the UNCLOS Treaty and that Somalia, whatever you may think about that as a nation-state, has consistently maintained— Does the U.S. have? Does the U.S. have? I mean, at what point does the U.S. jurisdiction start and end? Well, at what point does the U.S. have jurisdiction in a case like this? Well, in my view, the jurisdiction over these particular charges would begin at 200 miles. Obviously, what happened 900 miles where the boat was taken, the hostage taken, the piracy, the kidnapping, I'm not making— We have four Americans murdered— Yes, sir. —on the—and the United States doesn't have any jurisdiction, notwithstanding the fact that four of its citizens have been shot in cold blood. Well, Your Honor, I believe under the law that over the murder and firearm charges, that would be correct. They were pirated and taken hostage in an area. Would they would have jurisdiction over the piracy? Because again, that doesn't—that's not—that's the high seas. Well, I'm saying, yeah, I don't think you can just draw a clean line between them because as this case amply shows, pirates don't just commit piracy. They commit a whole lot of other felonies as well, including firing at an American ship and just killing four American citizens. And if we can say the United States doesn't have jurisdiction within 200 miles of a particular coastline when its citizens are being slaughtered, you know, that is a staggering holding. Well, Your Honor, again, I'm not—I understand the court. I'll respond to see my time is up. But the fact of the matter is you and I and none of us drafted the statute. They could certainly have made murder on the high seas, just like they say piracy on the high seas. That's not what Congress did. They said murder in the special maritime jurisdiction of the United States, which is a much narrower jurisdiction. And it—while the result, I don't think that—or I would ask the court to look to see what is the jurisdiction, not what the result is. Certainly, it's a brutal, brutal case. The court knows it started out as a death penalty case. And my client, Mr. Ellenson, and one other gentleman were facing the death penalty, and that wasn't the result. But the issue is what is the jurisdiction. Congress could tomorrow change the jurisdiction of murder, and they could say it's the high seas. Jurisdiction is not determined by the result. Exactly. The jurisdiction is if—is not determined by the result, exactly whether it's any kind of crime. Thank you. And the jurisdiction has been—the federal courts have said high seas has been described in federal law as the area of the sea beyond a nation's sovereign territorial waters. Yes, sir, that's the issue. That's the issue, is to whether high seas— whether something can be interpreted as the high seas if it lies between and beyond a nation's territorial waters. Well, no, sir, I would say it's clearly something beyond a nation's territorial waters is clearly the high seas. The real issue in this case is who gets to define Somalia's territorial waters. Do we get to do it under a treaty when it's a brutal case and we want a certain result, or does the sovereign nation get to define their territorial waters? I'm making no argument that something that's on the high seas we would not have jurisdiction over. Thank you, General. Yes, sir. Ask my colleagues if they have any further questions. Thank you, Your Honor. Good morning, Your Honor. This may please the Court. Ben Hatch on behalf of the United States. This trial below is a protracted proceeding, and Chief Judge Smith, I think, in light of the capital nature of the case and I think in light of also some of the difficulties these cases present, having acts that occurred overseas, I think, did take measures to ensure that there was a fair chance for the defense to present their case. And I think the trial was well managed, and that's why the Court only has these allegations of error before it, and I would submit to you neither of them have merit. Beginning with Mr. Ellenson's arguments, I believe the first question was asked, that the duress defense does not apply to the murder counts. And Mr. Ellenson argued to this Court that it does, but he argued below that it did not. That's at page JA-2387, where he made that concession, that duress does not apply to the murder counts. And the resulting duress instruction, which I believe was proposed by the defense, and Judge Smith did give, we did oppose that instruction. And I would tend, for my part, to concur that the instruction, perhaps in the usual case, may not have been warranted, but it was given in this case. But that instruction, which is on pages JA-2717 to 18, only applied to counts 1 to 15 and 20, so it excluded the murder counts. What evidence of duress was there that would justify the instruction? Well, my opinion, it was minimal. Mr. Ebrar gave a statement to the FBI shortly after these events, in which he said that, and I think this goes, Judge Wilkinson, to your question about the witnesses, that his account was that he had come aboard the boat, the Al-Qasim, and that two individuals had put a gun to his head. Those individuals were Muhammad Herzisa Ali and Muhammad Salad Ali. He identified them. And that, therefore, once he'd gone on the boat, you know, they put a gun to his head, and that's why he had to go along with it. That was his statement, I'll say. And we didn't put him in the joint appendix, but these men took pictures of themselves after they'd taken the quest, and there are pictures of Mr. Ebrar, like there are pictures of the other men, holding weapons. He has some of the victim's clothing on, and Mr. Ellenson may have a different view, but he did not look to be under duress. He was on the team roster, too, wasn't he? He was on the list of pirates. So there was very strong evidence, but his statement to your question, Judge Wilkinson, was essentially the only evidence, and, of course, that was a self-serving statement. But the two men- That statement was entered in the record? It was, Your Honor. That statement was entered. The government put that statement into evidence. The FBI had to have viewed him or something. Exactly. We put his statements in through the FBI agent. I mean, you really went over backwards with that instruction. You probably went over backwards in offering it, but you did. Well, I think we actually opposed it below, so I candidly did not view there to be sufficient evidence for a duress instruction. She gave it, and it sometimes happens on my side of things. When you lose below, you can be happy when you come up, because the defense got the benefit of the doubt. And so there's really no issue. We're not in the context of whether a duress instruction should have been given. It was given. You don't mean happy in the context of maybe what happened to these defendants in the sentencing, but you mean pleased with how the procedure worked because it strengthens your position when you own appeal. Thank you. Yes, Your Honor. Exactly. There can be no. The defense got the benefit of the doubt. They got their instruction, and the jury had it before him, and they decided that the way that he did and found him guilty. But I would say the only two people he said who would have knowledge of that essentially gun to his head were two people who were made in the United States and were made available to him at the trial. And I believe Mr. Ellenson actually went and spoke to those two men himself without the government present. He didn't just have to rely on government reports. He met with them without us present. He met with a lot of the other defendants. He ended up calling one himself, and I think he told Judge Smith that they just, you know, based on his meetings with them, would not support Mr. Ebrar's position. But that's a factual problem. That's not a legal problem. And I will say that one of those two men, this isn't a case where, okay, they're both cooperating with the government. Maybe they didn't want to do anything they thought we wouldn't like. Mr. Salat Ali testified on the other side of the Chivin case. He testified for the defense, and I cross-examined him. So Mr. Salat Ali was no stranger to testifying against the government. Is there any evidence in this record, or is there any procedure to find out that these two people, I'm not saying what the answer is, but that these two people he wanted to call even existed? Well, I believe Mr. Ellenson said that, I don't believe he ever put forward names for them. I believe he said he hadn't been able to talk to them. I assume maybe his client had told him about these people. But I said, was there any evidence? A client, people can make things up. Was there any evidence in this case, not this determinative, that these people, I'm just thinking through this, actually existed? No. Because I'm just thinking this, any time a person gets charged, they could claim that their key witness, who knows the opposite, is in the middle of ISIS territory. And he can't be found. That cannot be the basis on which an indictment is dismissed. That would certainly be our position, that it's very easy in these extraterritorial cases, if that were the precedent. Just let me say, and I'm not saying, I don't know the specific facts here, as what was done. I can't remember what was done. But I think what you're leading to is, I think you're going to say, if I'm correct, you just can't set that as a standard. There are many places in the world today where it'd be very easy to say, I have witnesses, and the United States can't go to those places. There are many places. And in light of something like that, although I don't think that was a justification, didn't the district judge, perhaps to your displeasure, and I use that just as a loose comment, did things that you just assumed she'd not do? Did you object when she suggested that she would let him take the stand and testify on a very narrow subject of duress? I did not object. Have you ever seen that done very often before? No. But Chief Judge Smith is an extremely experienced judge who was managing a multi-defendant capital case. And I have no reason to try to oppose the way she was trying. I'm not critical of her. I'm just saying, that is an extraordinary thing. I had not heard that before. He ultimately elected not to even, obviously, avail himself of that route. And these two witnesses that he ultimately narrowed it down to, not named, and they would have said that he worked, I believe, in a grocery store at one point. In my experience, and if you looked at these other gentlemen who were brought to the United States and prosecuted, it's not like you have to go to pirate college. Many of them had had other occupations just the week before they turned to this. I mean, that's the unfortunate, one of the unfortunate things about what drives men to do this is that they were, you know, there's big money in it, and they came from a poor, unfortunately, background. And it lured many of these men from a herding background or from a fishing background. And they'd be a fisherman one day, and then they would be on one of these boats the next. And so even that proffer of evidence, whoever, if these people existed, wouldn't have been inconsistent with him going to do this. And these people weren't on the boat. He said, that's when I got coerced, was on the boat. So none of them could have given, and I think Judge Smith said that too, that you have to have direct evidence before you can start to corroborate. And so you've given no direct evidence here. And I would just say, and it goes to this point about saying, there's some witness somewhere that you can't get to that should dismiss an indictment. Mr. Ellenson said, we brought Mr. Ebrar here from Somalia. But that's just not correct. We brought Mr. Ebrar here from the high seas where he went out and committed these crimes. We didn't go into Somalia and get him. He went out and got us. And so to say that a person who's gone out and done these things can say, well, there was something back home that I had to have and this case couldn't go forward, I just think I could not find any case law supporting it. And we've summarized that in our brief. Turning, unless there's any further questions on Mr. Ellenson's arguments, turning to Mr. Woodward's arguments. One thing I do want to clarify, the special maritime and territorial jurisdiction, 18 USC section seven, that applies to some of these counts, includes the high seas. So that is not more limited than the high seas jurisdiction that applies to piracy or that would apply to some of the other counts. And so I respectfully disagree with him. If it was on the high seas for piracy purposes, it was on the high seas for the purposes of any of these other counts that use the special maritime and territorial jurisdiction of the United States. So I don't believe those present different questions. Case law is pretty uniform on that, is it not? It is, your honor. I mean, there's no case, frankly, nobody says Somalia has 200 nautical miles of territorial sea. Nobody does. Your honor, I would disagree with that. In the seventies, your honor, I believe they did assert the 200 mile sea. Then in 89, they adopted the United Nations convention on the law of the sea, which says signatory states cannot go beyond 12 mile territorial seas. That was in this convention, 166, I believe countries have signed it. At the time they adopted that, they also issued domestically a statement that said the United Nations convention on the law of sea is the law of the land as it pertains to Somalia. So the statement press conference. Your honor, I have it right here. I don't believe it was a press conference. Was their sovereign legislative body ratified? The Supreme Court said, you know, you can end the treaties, but unless Congress ratifies them, that doesn't make any difference. And this was cited in our brief, your honor. It's available through Department of State websites. And I would be speaking beyond my experience to try to describe exactly the contours of the Somali government at that time. So I wouldn't try to say. Could you do it now? Could you even do it now? I wouldn't try to, and it's changed, unfortunately, as the court, I'm sure, is aware of the history there. But from the Department of State's website, again, they issued, and I believe. This is the president of Somalia at the time, your honor. I didn't understand it to be a press statement. Is it from their legislative body? It's from the president. Similar, I would say, again, I'm not gonna pretend to be. Maybe it's an executive order. But President Reagan, of course, through the White House, set some of the policy on what the United States uses, which is a maximum of 12. And so. I mean, you class aside, we can discuss what adoption means. But you class aside, if there ever was a rule of customary international law by which the vast majority of nations abide, you class fortifies that understanding. But even those nations which have not ratified or adopted you class still understand the 12 mile limit. And the havoc it would wreak upon not only unlawful felonies, beyond that limit, but also on commercial shipping and interception of commercial shipping would be unbelievable. I think we'd probably be the only court in the world that extended a nation's sovereign prerogatives to a 200 mile limit. I mean, I don't know. We would be the object of some derisive attention were we to make any sort of statement like that. I could find no other authority that has done so. That's correct, Your Honor. We wouldn't be declaring what their territorial waters are. We would be, the world construes by wit. We construe by the law. As Bolt said in Man for All Seasons, not by wit, in policy and politics. The question is jurisdiction. Now, the jurisdiction statute seems to set out that the country sets forth what its sovereignty is. Limits are. Correct? That's what it says, the letter of it. The statute that gives you jurisdiction, you know it. What does it say? Doesn't it say what? It's the high seas, is essentially. No, what does it say in terms of what is the territorial reach in terms of a felony? We're not talking about, I mean, you got plenty of murder claims here of piracy. So we're not talking about Americans dying, and there's a lot of reach. We're talking about the counts that are not connected to the piracy, the murder, correct? That's what we're talking about. Well, actually, there's two sets, Your Honor, and I don't know about the set that's just murder. One set. One set, 16 to 19, is murder within the special maritime and territorial jurisdiction. And that's that, like Your Honor says, is tied to the high seas. The other, and specifically that place where the murders happened. The other set, 22 to 25, are the 924J convictions. And that's an ancillary offense, murder with a firearm, that actually incorporates several underlying crimes of violence, one of which was the piracy. That's why I mentioned it, because if the position is going to be that, well, we had jurisdiction over the piracy at least, then I would think the 924J counts are in no trouble, because this court's already said when you have jurisdiction under the underlying offense, you have jurisdiction over the ancillary offense. But at least 16 to 19 relies only on the special maritime and territorial jurisdiction. And there, that's defined in 18 U.S.C. section 7 to include the high seas. And so then I look to authorities on what the high seas are. And that's the only language the statute uses, Your Honor. There's other language, but that's a pertinent language here. And this court in the Titanic case, in a very lengthy discussion of those areas, talked about the high seas are those areas outside the sovereign territorial waters. And so that's where I think this court has to decide are Somali's sovereign and the sovereign territorial waters are only the territorial waters, not the exclusive economic zone. They make an argument about that wasn't made below, doesn't apply for the reasons we put in our brief. But to this court, I do think has to decide for purposes of the United States statutes, how far do Somalia's sovereign territorial waters go? And I think there's several routes to say that they do not go more than 12 miles. One would be, how do we do that as a United States? We decide that for that. No, we're deciding that for our purposes of our statutes and our constitutional authority. So Somalia could tomorrow, I suppose, assert a different amount if it wanted to. That's its business as a country. But this court, how do you read the word sovereign out of that determination of high sea? The language says the sovereign territories, right? Well, the high seas, so the statute just says the high seas. I know, but- And this court in the Titanic, it's well understood, I think, if you look at the history of the international law, that there's your inwards waters, so the Chesapeake Bay inside your borders. Right. Those, obviously, you have total sovereignty over. Then there's your territorial waters, which historically varied until the UNCLOS convention, but now they go out to up to 12 miles. And over those, you have complete sovereignty. So any type of criminal offense, anything that's all a nation's domestic sovereignty, anything beyond the territorial waters, that 12 mile mark is high seas, is international waters also referred to. And that's what the Titanic case said. That's what the UNCLOS- Why didn't the statute say 12 miles rather than saying, in that sense? Well, the statute, I think, was written well before the United Nations Convention on the Law of the Sea. So it's modified then by, well, Ecuador, for example, they still say they have 200 miles, don't they? I don't know, Ecuador. If I can, I'll take your honors. I'm sure your honor's right about it. There are still, Judge Smith, there are still a few states that assert something beyond the 12 mile mark. But the law in this court, in the Deary case, affirming Judge Davis's opinion below, for customary international law, it doesn't have to be literally every country- Why wouldn't a pirate kingdom assert every drop of water in the earth? Why would it stop it? I mean, if it wanted to, why wouldn't it stop? Why would it stop at 200? And that's why we have our statutes- Your argument is, so what I take it to be, I'm just asking this question, I'm not arguing, but there has to be something in the U.S. law which indicates where the U.S. accepts, or by decision or statute, that the U.S. determines that within that number, within that mileage from the coast, it belongs to that sovereign nation to decide what to do. Right, a unilateral assertion is not effective as to every other country in the world, just because a country says I've got it doesn't mean they have it. Customary international law- And our assertion that it is effective is effective in our courts. Correct. What case do you cite for that? The case I cite for that? That's saying that we don't have to recognize what another country sets forth as a sovereign limit. What case do you cite? Well, this is one of those intersections, Your Honor. This court is in the context of construing criminal statutes and constitutional authority, but it's- So you don't have a case? I'm sorry. You don't have a case? The, well, the Titanic case, for example, not specifically, but it lists, it walks through the different areas. But no, I'm asking you a very specific question. You said that we don't have to recognize anything other than 12 miles, notwithstanding what other country does. I'm asking you, do you have a case that has adjudicated that, as you just said? Well, Judge Smith's decision below, I mean, that's, I believe she- Well, that's a tautology, isn't it? I thought we're here on appeal for that, but go ahead. Well, I'm not, I agree that this claim has not been raised before- So to answer, you don't have a case? I don't, but President Reagan, you know, a lot of this policy is obviously set state to state. And then this court, I think, looks to that for purposes of customary international law. So the policy of the United States has been, we will recognize the claims of other states of territorial seas up to the international limit of 12 miles. But these are all political questions. If it was solely a political question, we wouldn't have jurisdiction here. It has to be said, I'm asking, so there's no case that has adjudicated that, what you just said, right? I'm just wondering, is this a yes or no? I can't say that there's a case. I have on the tip of my head that said, this country, other than the decision below, asserted beyond this mark, but we're not gonna- If we can assert that their sovereignty over a 200-mile area offshore, what would prevent a particular nation from asserting its sovereignty over the entire Atlantic Ocean? For example, I mean, why would it stop at 200? The point is that there are often not international consensuses about anything. But one thing there is an international consensus is, is this 12-mile limit. And if you start breaching that and say no, it extends 200 miles out, I don't know why you would stop at 200. I mean, as I said, why not just assert your territorial rights over the entire Atlantic Ocean? No, no, no, there's water on Mars, most recently. And you don't have a case that says specifically what you suggest, is that correct? A case that says we recognize that for purposes of a statute like this, 12 miles. You have no such case. Are you hoping to have such a case? I have the case below. I thought it was a good one, and I hope this court will agree with it. And I would just say, last thing, if I may, I know I'm in the red here, but I don't think it's escapable that the courts in different contexts have to determine a nation's territorial seas because even the 12-mile limit is up too. So a nation could say, I'm not even asserting that full limit. And a court in an in-realm case, in a Titanic-type case, may have to say, well, I'll look to what that nation has done. I'll look to international law and resolve it. That's what Judge Smith- We don't need to get into that. Judge Smith, I think, issued a great opinion on this. I believe it's appropriate. Thank you. Mr. Ellenson, I think you've reserved some time for rebuttal, sir. One more try. One more try. I think Your Honor, Judge had talked about if you got a witness in ISIS-held territory, well, then maybe we shouldn't be bringing them over here to try them in federal court. Maybe we should just be trying them down in Gitmo or try them in whatever other way they want to try them. But if you're going to try them over here, if we're going to bring them to federal court in Newport News in Norfolk and try them- Oh, so you're suggesting that if they're terrorists doing something to Americans outside the territory of the U.S., they should not be brought and tried in federal court? If you're going to bring them over- No, no, no. Is that what you're suggesting? No, that's not what I'm saying. Oh, you're suggesting then they come and be tried here, but then there's such limitations that they won't be tried on the battlefield. They'll be tried here, and to try it here, you have to dismiss the indictment because they can't get the witness. If there's a credible case that you can make, that you have witnesses that would be really helpful to your case, that have a lot of input, then yes, you can't try them here. Then in those situations, the case would have to be remanded and sent someplace else to a different jurisdiction. But we don't even- Mr. Hatcher is suggesting we don't even know if these witnesses exist. I wasn't even- Well, I understand. I respectfully- My client told me about them. We understand. We try to point out the potential. This is a very significant thing, too, because we try to point out the potential for abuse that anybody could point to fictitious characters who couldn't be found or couldn't, even if they weren't fictitious, could not be subpoenaed back in another country. And if they couldn't be brought before the court, we would do what everyone agrees is a drastic and extraordinary thing, which is to dismiss the indictment. I mean, both prongs of this case have truly staggering implications. What I'm saying, Judge, is that I've been trying cases 34 years. Clients do come to you and tell you stuff that may be inexactly right. And I'm able to get an investigator, and he's able to go out and tell me, is my client blowing smoke, or is he telling me what's for sure? And I got a couple of witnesses. So the difference in this case is that I wasn't able to send my investigator to find out the veracity of what my client was telling me. And that's the- I'm sorry. And that's just the frustration as a trial attorney of not being able to- Getting back to the bottom line question of it, I mean, I think the reasons we've been over that there's a right to try these individuals there's also a concomitant right to give them a fair trial. Yes, sir. And Judge Shedd pointed out several ways in which the district judge said, yeah, we have every right to try these people. We have no right not to give them a fair trial. But at least in two instances, the duress instruction was given, and also the scope of cross-examination was limited. And that too is extraordinary. I mean, we're not dealing with some foreshortened or summary proceeding here. You're dealing with a judge that took these proceedings very conscientiously. And to me, I don't think there's any question we have the right to try these individuals. For me, the question comes down, did they receive a fair one? I just ask you to respond to the fact that not only did they receive a fair one, but they had a judge that bent over backwards to respect their rights at every turn. She did a great job. She was very lenient, and she tried to do, she did everything that she possibly could. But the two witnesses that I wasn't even able to find out do they exist, but the proffer was, they were not, they would have contradicted the prosecution's witnesses specifically to the point that my client got on the first pirate boat with an AK-47. They would have testified that, no, that's not how he got on the boat. He got on the boat because of balahule. And again, if they existed, that's correct. If I'd been able to have my investigator go talk to them the way I get my investigators to talk to them in Newport News, then I could, maybe I wouldn't have been able to say this, but I don't know. I don't know. And if we're going to bring them over here, then I need to be able to treat them just the same way as I treat all my other clients. No different. And that's just my, that's my frustration in this case. I'm sorry, I'm not trying to be disrespectful or anything. I'm just, I just, as a trial attorney, it just, it just, I want to give them the same thing I had the rest of them. But anyway, thank you very much. Mr. Ellison, both you and Mr. Woodward are court appointed. And I do want to thank you both. It's a very challenging case for the fine job that you did. And the court's very appreciative of your services. We will adjourn court now. And we will come down and greet everyone. This honorable court stands adjourned. Signee die. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Dennis W. Shedd